# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 13, 2012

No. 11-50169

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

MICHAEL HERBST,

Defendant–Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:10-CR-2106-1

Before REAVLEY, DAVIS, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:*

This case involves the admissibility of psychological or psychiatric expert testimony to negate the specific intent element of a charged crime. Defendant–Appellant Michael Herbst sought to introduce testimony of his low borderline intelligence through the expert testimony of a clinical psychologist. Because we find that the district court did not, however, abuse its discretion in excluding such testimony, we AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-50169

# I. BACKGROUND

## A. Factual Background

Michael Herbst made a living in Philadelphia, Pennsylvania selling event tickets. National ticket brokers would give him tickets on consignment when they could not sell them themselves. In order to conduct his business, Herbst used computers in hotel lobbies or libraries to access the internet. While using one such computer, he met a woman in a chatroom who identified herself as Maria Santiago from Mexico. Santiago called Herbst a couple of times, and during those conversations, Santiago was flirtatious with him. In January 2010, Herbst decided to fly from Philadelphia to El Paso, Texas to meet Santiago. After arriving in El Paso, he took a taxi to Juarez, Mexico where Herbst met and stayed with Santiago at her house for about a week. They were sexually intimate. Following that week, Herbst left Mexico.

Near the end of February, Santiago contacted Herbst again and, following their conversation, he hitchhiked to El Paso from Florida, where he was working at the time selling tickets, walked across the Bridge of the Americas into Mexico, and met Santiago in Juarez. They went to Santiago's house where, as Herbst described it, Santiago was "real friendly with me, I was friendly with her. We were intimate." Herbst stayed for a couple of days and then left to go to California. He walked back across the bridge and hitchhiked west, hoping to be a contestant on *The Price is Right*.

In March, Herbst was in Colorado. He stayed there until June, when, in response to a request by Santiago, he returned to Juarez. During the visit, Herbst got a Texas driver's license, which he claims was Santiago's idea. When he applied for the license, he used a Liberty Street address in El Paso because he believed Santiago had a friend who lived there. Then, on June 20, Santiago gave Herbst a 1993 Vandura van. Along with the van itself, Santiago gave Herbst an insurance policy on and a title to the van—both in his name. Herbst

says he had nothing to do with registering the van, getting it inspected, or obtaining insurance for it. On occasion, after the van was purchased, Herbst drove it into the United States to do the grocery shopping for himself and Santiago at a Wal-Mart. Each time he crossed the bridge, he was referred to secondary inspection by border patrol. On about July 13, Santiago took the van to a mechanic's shop to have the timing belt replaced. Santiago picked the van up from the shop on July 16 and brought it to Herbst.

Later that day, Herbst decided to go to El Paso to drink for the night. He did so because it appeared to Herbst that Santiago did not like it when men drank around her. He planned to go to a motel and to pay for a room with cash he received from Santiago. The idea to go to a specific motel came from Santiago. That night, July 16, 2010, Herbst drove the van alone towards El Paso. When crossing the bridge, Herbst stopped and presented his United States passport card to a border patrol officer. Herbst advised the officer that he was coming from his girlfriend's house and that he was a ticket agent.

The border patrol officer observed that Herbst appeared pale and that his lips were white. As the border patrol officer inspected the van, she observed that there was nothing in the rear of the vehicle and that it was very clean. The border patrol officer also observed that Herbst's physical appearance did not appear to "fit" that of the van because while the van was clean, Herbst looked like he was homeless. Herbst never made eye contact with the officer but instead just looked straight ahead. The officer testified that the computer screen in her booth reflected a computer-generated alert that required a secondary inspection of the van based upon its license plate number.

At secondary inspection, Herbst advised an officer that he had owned the van for approximately one month. During a canine inspection of the vehicle, the border patrol officer observed that Herbst was fidgeting. In response to an officer's question about how long he had been at his girlfriend's house, Herbst

stated that he had been there for approximately two hours.  When asked how long he had been in line, Herbst responded that it had been approximately one and a half hours.  In response to questions relating to the van, Herbst stated that he had bought it in Colorado and that he had registered the van in Texas. The dog then alerted on the van.  A search of the van revealed 163 bundles of marijuana, weighing approximately 175.38 kilograms, concealed in the ceiling of the vehicle.  The marijuana had a street value of between $35,000 and $43,000.

From there, Special Agent Isidro Nunez took over the investigation of Herbst.  Upon inspection of the vehicle, Nunez observed no clothing, personal effects, or toiletries, and there were no signs to indicate that someone was living in the vehicle.  Inside the vehicle, Nunez located a Texas registration for the vehicle, an insurance ID card, and a piece of paper.  The registration receipt reflected the date of June 23, 2010, and the information on the receipt reflected the name and address as "Michael Herbst, 262 Liberty Street, El Paso, Texas." The insurance policy was also in Herbst's name with an  effective date of June 23 through July 24, 2010.  A Texas vehicle inspection report for a 1993 GMC Vandura was also found in the vehicle with the other documents.  Nunez found a piece of cardboard on which was written a telephone number, a name, and what appeared to be a city in Colorado.  Inside Herbst's wallet, Nunez found a Texas Department of Public Safety temporary driver's permit, listing the 262 Liberty Street address as Herbst's.

Next, Nunez interviewed Herbst.  Herbst stated that he owned the van, that he had purchased the vehicle off of Craigslist, that he had paid $1,700 for the vehicle, that it had approximately 90,000 miles on it, and that he had purchased it on June 20, 2010, in Lakewood, Colorado, from an individual named "Fred."  He said he had met Fred at a McDonald's or a Burger King.  He

No. 11-50169

said that, after he had bought the van, he drove it back to El Paso, had the vehicle inspected, purchased insurance for the vehicle, and registered the van.

When Nunez asked Herbst during the interview if he knew why he was being detained, Herbst responded that it was because of contraband. When asked to explain his response, Herbst said that he smelled marijuana. Nunez asked Herbst if he knew the weight of the contraband found in the vehicle, and Herbst replied that he did not. At that point, Herbst claimed that he was "framed." When Herbst was asked for details on Santiago or Fred, he would not respond to questions and put his head down. He said he did not know how to reach Fred and he did not have a phone number, address, or location for Santiago. When Agent Nunez advised Herbst that he was going to interview persons at the 262 Liberty address, Herbst then stated that he did not live there and that he found the address on the internet by searching Google. At that point, Herbst told the officer that he lived in the van in various parts of El Paso. Herbst told the officer that he kept personal items with his girlfriend, Santiago, and that the night before, he had stayed in the van in a Wal-Mart parking lot.

Nunez continued his investigation by visiting the 262 Liberty address. Nunez found no evidence that Herbst had ever lived there. Nunez also obtained records relating to Herbst's passport, and the records reflected that the application was made by Michael Herbst, with an address of 1500 Rowena, Thornton, Colorado. Nunez subpoenaed Craigslist records. The records indicated that an ad for the sale of a 1993 GMC Vandura in the Denver area was posted on March 8, 2010, and any questions were directed to "Fred" at a Denver phone number. The cell phone records for Herbst's cell phone showed no record of any call from his phone number to the phone number on the Craigslist ad. The records did show numerous calls in June and July of 2010 involving a phone number with a prefix from Juarez, Mexico.

No. 11-50169

From the Craigslist information, Nunez tracked down Freddy Boston, of Denver, Colorado, who said that he previously owned a 1993 GMC Vandura van which he sold in March of 2010. In response to his ad, Boston received numerous phone calls from a man who spoke very little English and who was interested in purchasing the van. Two different men met with Boston and agreed on a price of $3,900.00. They also agreed that another person would travel by bus to meet Boston to pick up the vehicle and consummate the sale. On March 28, 2010, Boston met with two Hispanic men, who were different from the two men he had met with previously, and sold them the van.

Nunez tracked the registration on the van to Alma Romero, who owned a vehicle-titling business in El Paso. According to Romero, two Hispanic men came to Romero's office on June 22 inquiring about an estimate to register a 1993 GMC van. At that time, she advised them that they could not register the vehicle because the person in whose name the title was being placed was required to be present and that person needed to provide his signature and valid identification. The next day, both men returned to Romero's office with a man who looked like Herbst. Romero testified that she made a copy of the Colorado title for the 1993 GMC van. That Colorado title listed the previous owners as Fred and Sabrina Boston, and the back of the title reflected the signature of Michael Herbst. The application for registration of the vehicle was signed in Romero's presence by "Michael Herbst." Romero told Nunez that the man who signed the application presented her with a temporary driver's license for "Michael Herbst," a copy of which she placed in her file. The title application reflected the address for Michael Herbst as 262 Liberty Street, El Paso. Romero stated that she went with the two other men to have the vehicle inspected and assisted in obtaining insurance for the vehicle. Herbst did not go with them to have the vehicle inspected. The two Hispanic men later returned to Romero's office to get the license plates for the vehicle.

Lastly, Nunez obtained the crossing history of the van, which showed that Herbst had crossed the border in that vehicle several times. Prior to July 16, 2010, the vehicle was referred for secondary inspection on June 27, June 30, July 4, July 8, and July 12. Nunez thought that this was an example of "burning plates," a tactic used by drug trafficking organizations to run a license plate across the border several times so that it was not new in the system for the purpose of decreasing the likelihood of a detailed inspection.

Herbst was charged in a two count indictment with importation of a controlled substance in violation of 21 U.S.C. §§ 952 and 960 and possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841.

## B.    Procedural Background

Herbst sought to offer the testimony of clinical psychologist James Schutte, Ph.D., as an expert to establish that Herbst had borderline intelligence and was therefore more prone to manipulation by others than the average individual. Herbst advised the district court that Schutte's testimony would assist the trier of fact because his testimony was relevant to the issue of whether or not Herbst had knowledge that drugs were secreted in the van. Herbst did not purport to raise an insanity defense.

The district court held a pretrial hearing to consider the Government's motion to exclude Schutte's testimony. During the hearing Schutte testified that, pursuant to his administration of commonly used psychological tests, he was of the opinion that Herbst had "borderline intelligence" and was "more prone to manipulation than the average individual." According to Schutte, "borderline intelligence" meant "on the border between mental retardation and normal function." Schutte stated that the key indication of Herbst's borderline intelligence was the determination that Herbst has an intelligence quotient (IQ) of 72, two points above the cutoff for mental retardation. When asked if Herbst's low IQ would be apparent to a layperson, Schutte stated that it was his opinion

7

that it would not be.  Regarding his opinion that Herbst was more prone to manipulation, Schutte testified that Herbst "ha[d] more difficulty than the average person [did] in reasoning; long-term planning; appreciation of a situation and all of [its] nuances; [and] the ability to detect when he [was] being manipulated or coerced."  He further testified that, "because of that limited reasoning capacity, [Herbst] ha[d] more difficulty in judging a situation than the average person [did]" and that it was easier to take advantage of a person with Herbst's low IQ.

The district court asked Schutte if "one [could] be manipulated because one is more gullible and still form whatever mental impression is necessary to accomplish a task."  Schutte answered, "Yes. A person can accomplish a task without being aware of the reason for performing it."  When asked whether Herbst could appreciate right from wrong, Schutte stated, "I think [Herbst] understands right from wrong." With regard to whether Herbst was able to take direction, Schutte responded, "I think he can take very simple direction.  But . . . , since he's so easily distracted, he requires a great deal of supervision in order to carry out a task without getting off on a tangent."  Schutte was specifically asked whether he was able to formulate an opinion as to whether or not Herbst knew there were narcotics in the van.  Schutte responded that, beyond Herbst's statement that he had no knowledge, he could not render an opinion on that. Likewise, when asked if he could state an opinion on whether or not Herbst was manipulated, Schutte stated that he could not.

The Government cross-examined Schutte regarding his conclusions. Schutte acknowledged that Herbst's statements to him about how he had obtained the van were different from the statements he had made to border patrol officers after his arrest.  Specifically, Schutte testified that Herbst had told him the vehicle was given to him by a woman in Mexico, whereas the report of investigation indicated that Herbst said he had owned the vehicle since June

and that he had learned of the vehicle through Craigslist. When asked if coming up with a new alibi for a criminal charge was demonstrative of Herbst's ability to plan and reason, Schutte stated that, since even children were able to lie, it did not require a high degree of intellect to say something that was not true.

The prosecution also cross-examined Schutte regarding the relationship between Herbst's alleged level of intellectual functioning and the knowledge element of the charged offense. In response to the question as to whether Herbst was capable of knowing whether or not he had something in the vehicle that he was driving from point A to point B, Schutte stated, "Again, all I can testify to is that he told me he was not aware that there was marijuana in the vehicle." When asked whether being more prone to manipulation prevented Herbst from forming the knowledge and the intent necessary to commit a crime, Schutte stated "I think that would depend on the crime . . . depending on what knowledge is necessary to execute that crime." In response to follow-up questions from the district court, Schutte clarified that Herbst was capable of driving a vehicle, that Herbst was capable of lying, and that he could not tell the jury whether or not Herbst was capable of having had the knowledge on this occasion or not.

The district court granted the Government's motion to exclude Schutte's testimony. In doing so, the district court stated that it failed "to understand how the testimony with respect to the Defendant's mental state ha[d] a bearing upon whether or not the Defendant formed the opinion to knowingly or intentionally participate." The court further stated that, if Herbst were to testify at trial, the jury had the ability to listen to and appreciate "the quality of the testimony and the demeanor," and could "form the impressions about whether or not [Herbst wa]s responding directly to questions, whether one [wa]s distracted, whether [Herbst wa]s capable of telling the truth or telling a lie." It also concluded that Schutte's proposed testimony "does not assist the jury in making the

determinations it's called to make," and that "it confuses the jury and distracts the jury, to provide information that is not relevant to the elements that have to be weighed and considered by the jury." In its written order, the district court stated that Herbst had "failed to provide any connection between Schutte's opinion regarding manipulation and how it would affect the determination of whether" it affected his "knowledge." Herbst filed a motion for reconsideration, which the district court denied for the same reasons it had originally granted the Government's motion to exclude.

At trial, the district court sustained the Government's hearsay objections each time Herbst attempted to tell the jury what Santiago had said to him in the months leading up to his arrest, such as direct quotes related to:

1) that, when they first met in the internet chatroom, Santiago had told Herbst that she was seeking an Anglo man and wanted to meet him;
2) that Santiago had asked Herbst to travel to Juarez to meet her;
3) that Santiago had told Herbst she wanted him to return to Juarez;
4) that Santiago had said she loved Herbst;
5) that Santiago had asked Herbst to return to Juarez in June 2010, because she missed him;
6) that Santiago had suggested that Herbst get a Texas driver's license;
7) that Santiago had suggested that Herbst use the 262 Liberty address;
8) that Santiago had told Herbst that all the paperwork for the van had been taken care of for him;
9) that Santiago had asked Herbst to go into El Paso to do the grocery shopping in the United States;
10) that Santiago had offered to send a mechanic into El Paso when the van broke down;
11) that Santiago offered to take the van in to have its timing belt replaced
12) that the idea that Herbst should go to El Paso to drink and spend the night on July 16 was Santiago's and that she had suggested the motel he should stay at; and

No. 11-50169

13)    that Santiago had told Herbst that she did not like men to drink around her.

Herbst claimed that the statements were offered not for their truth, but to show why he would have placed extraordinary trust in Santiago and to explain conduct that the Government alleged was suspicious. During closing argument, defense counsel stated that Herbst's defense was the following: "I had a girlfriend. I trusted her. She used me, and I didn't know." Herbst's counsel also argued that Santiago "lur[ed] unknowing, poor-hearted, lonely, slow men to be used."

Herbst was convicted on both counts and was sentenced to concurrent terms of five years in prison and to concurrent four-year terms of supervised release. Herbst timely appealed, challenging both the exclusion of Schutte's testimony and of the statements Santiago made to Herbst.

## II.  STANDARD OF REVIEW

We review evidentiary rulings for abuse of discretion, subject to harmless error review.[1] *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011); *see also United States v. Seale*, 600 F.3d 473, 490 (5th Cir. 2010) (exclusion of expert testimony reviewed for abuse of discretion); *United States v. Valencia*, 600 F.3d 389, 417–18 (5th Cir. 2010) (exclusion of evidence as hearsay reviewed for abuse of discretion). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Jackson*, 636 F.3d at 692 (internal quotation marks omitted).

---

[1] Herbst argues that the exclusion of Schutte's testimony violated his Sixth Amendment right to a fair trial and therefore should be reviewed de novo by this court. This is incorrect. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("[R]ules excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." (internal quotation marks omitted)); *United States v. Najera-Jimenez*, 593 F.3d 391, 402 (5th Cir. 2010) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." (internal quotation marks omitted)).

No. 11-50169

## III.  DISCUSSION

### A.     Schutte's Testimony

In 1984, Congress enacted the Insanity Defense Reform Act (IDRA), redefining insanity and making it an affirmative defense to be proved by clear and convincing evidence.  *See* 18 U.S.C. § 17.  The IDRA also provided that: "Mental disease or defect does not otherwise constitute a defense."  The IDRA does not, however, address, whether it precludes the admission of psychological or psychiatric expert testimony to negate the specific intent element of a charged crime.  We have previously recognized that "numerous other circuits"[2] have found that so-called "diminished capacity evidence is admissible to defeat the mental state requirement of a specific intent crime."  *United States v. Eff*, 524 F.3d 712, 720 n.11 (5th Cir. 2008) (internal quotation marks omitted).  This case does not, however, require us to weigh in on that question because even assuming that diminished-capacity evidence is admissible, Herbst cannot show that the district court abused its discretion in excluding Schutte's testimony.

To be sure, Schutte's testimony cannot be said to be irrelevant to Herbst's claim that he lacked knowledge of the drugs in the van.  Certainly, Schutte's testimony concerning Herbst's low intelligence and ability to be manipulated lends credibility to his assertion that he was duped into driving drugs across the border.  Yet, given the fact that Schutte testified that Herbst could nevertheless form the requisite intent to transport something from point A to point B and that he did not testify regarding the effect, if any, of the relationship between Herbst and Santiago on Herbst's ability to evaluate the circumstances relevant to this

---

[2] *See, e.g.*, *United States v. Dupre*, 462 F.3d 131, 137 n.8 (2d Cir. 2006); *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003); *United States v. Worrell*, 313 F.3d 867, 874 (4th Cir. 2002); *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997); *United States v. Childress*, 58 F.3d 693, 728 (D.C. Cir. 1995); *United States v. Cameron*, 907 F.2d 1051, 1060 (11th Cir. 1990); *United States v. Twine*, 853 F.2d 676, 678–79 (9th Cir. 1988); *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir.1987).

case, Schutte's testimony's relevance to the knowledge element of the charged offenses is not strong.

As our colleagues on the Eleventh Circuit have noted,

> [b]ecause psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury's [sic] from focusing on the actual presence or absence of *mens rea*, and (3) "may easily slide into wider usage that opens up the jury to theories of defense more akin to justification," *Pohlot*, 827 F.2d at 904–5, district courts must examine such psychiatric evidence carefully to ascertain whether it would, if believed, "support a *legally* acceptable theory of lack of *mens rea*." *Id.* at 906.

*Cameron*, 907 F.2d at 1067; *see also Schneider*, 111 F.3d at 201 ("[S]*pecific* medical evidence offered may still be irrelevant to the requisite intent or [the] probative value [of the evidence] may be substantially outweighed by confusion or delay." (citation omitted)).

In this case, the district court found that Schutte's testimony did not connect "how manipulation affected [Herbst's] 'knowledge,'" as defined by this court and "would only serve to confuse the jury." The concerns voiced by the district court mirror the cautions of the Eleventh Circuit and other courts about the difficulty of admitting diminished-capacity evidence. Herbst has made no showing that the district court's view of the law or Schutte's testimony was erroneous, *see Jackson*, 636 F.3d at 692; therefore, we find no abuse of discretion in the district court's exclusion of Schutte's testimony.

## B.    Hearsay

Herbst also argues that the district court abused its discretion in not allowing Herbst to testify regarding Santiago's out-of-court statements. Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted, *see* Fed. R. Evid. 801(c), and is generally not admissible as evidence,

No. 11-50169

*see* Fed. R. Evid. 802. Regardless of whether or not the statements constituted hearsay, their exclusion was harmless because their substance was largely introduced via the testimony of Herbst. Herbst testified that he met Santiago in a chatroom on the internet, that she flirted with him, that he stayed at her house in Juarez for a week and they were intimate, that he would go meet her in Juarez after she called him, that he cared for her a lot, that he believed she had the same feelings for him, that it was her idea that he use the Liberty Street address, that she purchased the van for him, that he was not involved with any of the paperwork for the van, that he shopped across the border for himself and Santiago, that Santiago gave him the address of the Wal-Mart to shop at, that Santiago did not like to be around men when they were drinking, and that, on the day of his arrest, Santiago gave him cash to use for the motel.

Additionally, there is substantial other evidence of Herbst's guilt. First, the 175 kilograms (or approximately 387 pounds) or marijuana secreted in the van was worth between $35,000 and $43,000. *See United States v. Garcia-Flores*, 246 F.3d 451, 455 (5th Cir. 2001) (finding that the defendant's control over a vehicle containing over 300 pounds of marijuana could be used by a jury to infer his guilty knowledge). Second, this court has held that "[p]erhaps the strongest evidence of a criminal defendant's guilty knowledge is inconsistent statements to federal officials," because "a factfinder could reasonably conclude that they mask an underlying consciousness of guilt." *United States v. Diaz-Carreon*, 915 F.2d 951, 954–55 (5th Cir. 1990). When Herbst met the first border patrol officer, he was pale, his lips were white, and he did not make eye contact with the officer. During the canine inspection, he fidgeted with his hands and fingers. Most importantly, however, the jury could have inferred guilty knowledge from the multitude of inconsistencies between the statements Herbst made to the border patrol officers, Herbst's testimony at trial, and the written and testimonial evidence introduced by the Government regarding

14

No. 11-50169

where Herbst lived, when and how the van was acquired, and how the van was registered, titled, and insured.

Given that the substance of Santiago's statements was offered via Herbst's testimony and the other evidence supporting the jury's finding of guilty knowledge on the part of Herbst, any error in not allowing Santiago's alleged statements into evidence was harmless.

## IV.  CONCLUSION

For the foregoing reasons, we find no error in the district court's exclusion of Schutte's testimony or of the statements Santiago made to Herbst, and accordingly, we AFFIRM the judgment of the district court.

AFFIRMED.

15