# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 10, 2013

No. 12-50136

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

HERMES FIDELINA MORAZAN-ALVAREZ,
also known as Claudia Fidelina Morazan-Alvarez,

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas

Before JOLLY, DAVIS and PRADO, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Hermes Fidelina Morazan-Alvarez appeals her conviction for unlawfully transporting an illegal alien for commercial advantage and private financial gain in violation of 8 U.S.C. § 1324. She argues that the district court improperly excluded expert testimony related to her post-traumatic stress disorder that was proffered to establish that she did not commit the offense voluntarily and did not have the requisite mental state for the charged offense. Because the proffered testimony was not admissible to establish duress

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-50136

to negate voluntary participation in the criminal conduct, the district court did not abuse its discretion by excluding the evidence.

I.

Morazan-Alvarez was charged by indictment with two counts of unlawfully transporting an illegal alien for commercial advantage and private financial gain (Counts One and Two), and one count of conspiracy to transport illegal aliens (Count Three).  Following a trial, the  jury found Morazan-Alvarez not guilty of Counts One and Three and convicted her of Count Two.  She was sentenced to thirty-six months of imprisonment and a three-year term of supervised release. She timely appealed.

Before trial, Morazan-Alvarez gave notice of her intent to proffer a defense of duress and to offer evidence, including expert testimony, establishing that she was a victim of physical and sexual abuse and suffered from post-traumatic stress disorder (PTSD).

### *Pretrial Motion in Limine*

The Government filed a pretrial motion in limine seeking to exclude any evidence that Morazan-Alvarez was sexually abused while she lived in her native country of Honduras.  The Government argued that the evidence was not relevant to whether she had the requisite mental state for the charged offenses. The Government also moved to exclude any evidence pertaining to "a defense of duress, necessity, or justification" unless Morazan-Alvarez successfully made a prima facie showing to support the defense.  Morazan-Alvarez filed a response.

At a pretrial hearing, Morazan-Alvarez contended that evidence that she experienced sexual assault and domestic violence more than six years before the charged offenses was relevant to the issue of "voluntariness."  Morazan-Alvarez alleged that the other participants in the alleged conspiracy exploited her mental weakness and PTSD to have her transport illegal aliens.  She urged that she was manipulated into committing the offenses involuntarily.

No. 12-50136

The district court excluded the proposed expert testimony that Morazan-Alvarez suffered from PTSD, ruling that the condition was not relevant to a duress defense. The court also ruled that the expert testimony could not be offered to show that Morazan-Alvarez did not voluntarily commit the offenses because it found no case law to support a conclusion that PTSD is relevant to the question of voluntariness.

*Trial*

The following evidence was presented at trial. On March 9, 2011, United States Border Patrol Agent Lorenzo Perez was patrolling an area near La Pryor, Texas, and saw three individuals traveling in the front seat of an extended cab truck that seemed to be heavily weighted. Perez, who was stationed near a stop sign, noted that the truck "kind of came to a slow roll and then took off again, kind of in a hurry to kind of get out of [ ] sight." Perez later directed the truck to pull over. Perez approached the passenger side and, as he looked into the bed of the truck, "saw two individuals, one underneath the carpet and one just laying down [in the bed]."

Ten people were found in the truck: three passengers in the front seat, two persons in the bed, and five individuals "laying down in the backseat area." Morazan-Alvarez was seated in the front of the truck along with Valente Hernandez-Escobar,[1] the driver and owner of the truck, and a female passenger, Dayna Morgado-Castro. Perez concluded that "[he] had a possible alien smuggling load."

Hernandez-Escobar testified that Morazan-Alvarez, whom he knew from living in Austin and with whom he had a romantic relationship, "asked [him] to help her out with some relatives that . . . were coming to San Antonio." Hernandez-Escobar agreed "out of the kindness of [his] heart." They met at

---

[1] Hernandez-Escobar, a codefendant in the case, pleaded guilty to conspiracy to transport illegal aliens; in his plea agreement, he agreed to cooperate and testify.

3

Morazan-Alvarez's apartment on March 8, 2011, and left Austin near midnight. Morazan-Alvarez – who had a "pen written map" directing them to the pick up location where an individual named Miguel would be waiting – spoke on her phone during the trip and appeared to be receiving directions. After arriving at the pick up location, Morazan-Alvarez exited the truck, and "a lot of people" entered. Hernandez-Escobar asked her what was going on, and Morazan-Alvarez replied "that there were some people and that [he] was going to get some profit" – i.e., $1,500 – for transporting the people in his truck.

Hernandez-Escobar stated that he was "tricked" by Morazan-Alvarez into participating and agreed to continue because "[he] didn't trust her," and felt "obligated to take the people." He noted that he was not told before the trip that he would be transporting illegal aliens. Hernandez-Escobar gave a statement to agents after his apprehension in which he stated that Morazan-Alvarez had revealed to him "exactly what [he] [was] supposed to be doing." Hernandez-Escobar later explained that he meant that he was told about the purpose of the trip "[w]hen they were at the place where [they] picked up the people."

Morgado-Castro testified that she traveled from Mexico with a group that intended to enter the United States. She recounted how the group crossed into the United States. She noted that three people were always up-front and appeared to be the guides. After a few days of traveling, the group stopped to await transportation. Morgado-Castro stated that no member of the group declared that they belonged to the Los Zetas gang. Morgado-Castro also did not observe any member of the group issue threats to any other person.

Morgado-Castro recalled that the group was informed when the truck had arrived and were instructed to run to the vehicle. Morgado-Castro, who arrived at the truck nearly five minutes after the other group members, was directed into the front seat by Hernandez-Escobar and Morazan-Alvarez. After the truck began to move, Morgado-Castro asked for water. Morazan-Alvarez, who was

No. 12-50136

"very kind" and did not appear to be agitated, offered a soda and stated that "everything was going to be fine." Morgado-Castro noted that Morazan-Alvarez, who told the group members to "put [their] heads down" as the truck moved along, stated "[w]e are caught" when the truck was apprehended.

Miguel Santiago-Lopez[2] testified that a person in Austin named Chaman called him and advised him that there was a group of people to transport from Mexico to the United States. Santiago-Lopez guided the group across the border. Santiago-Lopez testified that he talked with Chaman during the trip on a phone that Chaman had provided. Santiago-Lopez asserted that during the trip he found a jacket bearing the Ferrari logo, which is a symbol that is associated with Los Zetas. Santiago-Lopez denied that the jacket was his or that he was affiliated with Los Zetas.

Santiago-Lopez stated that he never communicated with anyone in the truck but rather talked exclusively with Chaman. Santiago-Lopez did not know if Morazan-Alvarez was associated with Chaman.[3] When the truck arrived, Hernandez-Escobar and Morazan-Alvarez opened the doors and told the group to "hurry up and get in." Santiago-Lopez got into the bed of the truck. After the group was apprehended, Santiago-Lopez gave a statement in which he denied being the guide. He stated that he was dishonest with agents because he was afraid and believed that he would be allowed to return to Mexico if he minimized his role.

United States Border Patrol Agent Colin McAllister testified that he took a statement from Morazan-Alvarez, which was transcribed and later signed by

---

[2] Santiago-Lopez, a codefendant in the case, pleaded guilty to conspiracy to transport illegal aliens; in his plea agreement, he agreed to cooperate and testify.

[3] The phone number associated with Chaman was saved in Santiago-Lopez's and Hernandez-Escobar's phones and was not in Morazan-Alvarez's phone. Hernandez-Escobar denied talking to Chaman.

her.  McAllister was aided by other agents with superior Spanish language skills.  In her statement, Morazan-Alvarez disclosed the following: she received a phone call from an unknown person telling her that he would pay her to "pick up [ ] [his] mother near the border or at the border and that she was to ride with a third party to . . . go do that."  The person directed her to ride in a red truck with Hernandez-Escobar, whom Morazan-Alvarez casually knew from Austin.  She did not know anything about the man who called her or the woman that she was to pick up, including, inter alia, whether she was an illegal alien.  Morazan-Alvarez "did it because she was scared."

Morazan-Alvarez drove with Hernandez-Escobar to the border area.  She then "received another phone call from the man" informing her that "things had changed and she was no longer suppose[d] to pick up his mother, but instead was to pickup this group of people."  They drove to the area where they had been told to go, "[a]nd the people . . . came out of the brush and got into the truck."  Morazan-Alvarez asserted that a guide with the group, who said he was a member of Los Zetas, threatened to kill her if she said anything.  Agents did not find any information to support that the guide identified by Morazan-Alvarez belonged to Los Zetas.

After further questioning, Morazan-Alvarez, who was crying and agitated throughout the interview, altered her version of the events.  She stated that Hernandez-Escobar "quarterback[ed] the whole thing" and that it was his mother that they were going to pick up.  Morazan-Alvarez stated that Hernandez-Escobar promised to pay her for riding with him.  When questioned about the inconsistencies in her stories, she "just kind of continued to say that it was . . . [Hernandez-Escobar's] idea and that she had gone along to get paid."  Morazan-Alvarez stated that Hernandez-Escobar "was a known smuggler" and that she "could take [agents] to his house in Austin where he ha[d] as many as

40 illegal aliens stashed. And that he gets paid something like $4,000 per person to smuggle illegal aliens."

Morazan-Alvarez proffered to the district court the following proposed expert testimony from Dr. Betsy Bouton-Puentes, Ph.D., a licensed psychological associate and counselor. Dr. Bouton-Puentes evaluated Morazan-Alvarez during her pretrial detention. Morazan-Alvarez "cr[ied] and express[ed] emotions of sadness and distress throughout the interview process." Morazan-Alvarez, while "amicable and in control," became upset and began to cry "[w]hen speaking of how she experienced abuse or how much she missed her family." She was "especially animated when describing her involvement with the people who arranged the crime for which she is [ ] incarcerated." Morazan-Alvarez, who began to take medication for anxiety while she was detained for a previous offense, "did not receive help for many years despite [ ] traumatic experience[s] of abuse and sexual assault." After she was released from her prior detention in January 2010, Morazan-Alvarez once again was threatened and went to live in a domestic violence shelter, where she received counseling. She reported that she "cries much of the time and cannot sleep at night because she sees the people who raped her."

Cognitive and neuropsychological tests indicated that Morazan-Alvarez suffered from cognitive abnormalities and that "a neuropsychological assessment [was] warranted to access the extent and severity of her brain impairment and [to] rule out a diagnosis of cognizant disorder." Further psychological tests suggested that Morazan-Alvarez suffered from, inter alia, PTSD. Dr. Bouton-Puentes concluded that "[c]onsideration should be given to the effects of [Morazan-Alvarez's] chronic abuse as this impacts her judgment and behavior with regard to her involvement in the incident offense." Dr. Bouton-Puentes indicated that when Morazan-Alvarez is threatened, "she is the first to comply due to overwhelming fear experienced from past experiences."

No. 12-50136

II.

This court reviews a district court's exclusion of expert testimony for abuse of discretion. *United States v. Ogle*, 328 F.3d 182, 188 (5th Cir. 2003). The district court's ruling will not be disturbed unless it is manifestly erroneous. *Id*. If this court concludes that the district court abused its discretion, it then considers "whether the error was harmless, affirming the judgment unless the ruling affected a substantial right of the complaining party." *United States v. Tucker*, 345 F.3d 320, 326 (5th Cir. 2003) (internal quotation marks and citation omitted). In the criminal context, the necessary inquiry is "whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence asserted." *Id.* at 27 (citation omitted).

To prove a violation of transporting an illegal alien under § 1324(a)(1)(A)(ii), the Government must show that: "(1) an alien entered or remained in the United States in violation of the law, (2) [the defendant] transported the alien within the United States with intent to further the alien's unlawful presence, and (3) [the defendant] knew or recklessly disregarded the fact that the alien was in the country in violation of the law." *United States v. Nolasco-Rosas*, 286 F.3d 762, 765 (5th Cir. 2002). Morazan-Alvarez asserts that the proposed expert testimony regarding her PTSD and its effect on the voluntariness of her acts was admissible to negate the criminal intent required by the statute of conviction. She argues that the testimony would have supported her defense that she did not voluntarily participate in the offense and did so only because she was vulnerable to the threats that she alleges were made against her.[4]

---

[4] We do not address the response raised by the government that the type of testimony proffered by the defendant is only admissible, if at all, to negate a specific intent element of the crime as this argument was not raised by the defendant and is unnecessary to the disposition of this case. *See United States v. Herbst*, 460 F. App'x 387, 394, n.2 (5th Cir. 2012) (citing cases and noting that this circuit has not decided the question).

Without characterizing it as such, the defendant's "voluntariness" argument, in effect, challenges the district court's denial of the requested instruction on duress.

> The duress defense is a common law concept that federal criminal law has incorporated. *United States v. Bailey*, 444 U.S. 394, 409-10, 100 S. Ct. 624, 634, 62 L. Ed. 2d 575 (1980). Under this defense, otherwise criminal behavior may be excused under narrow circumstances. To succeed with this defense, the defendant must show [inter alia]:
>
> 1. that the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;

*United States v. Willis*, 38 F.3d 170, 175 (5th Cir. 1994).

This defense cannot apply to Morazan-Alvarez because whether a fear is well-grounded is assessed on the impact of the threat to a reasonable person , i.e. "that a person of reasonable firmness in his [or her] situation would have been unable to resist." *Id.*  Because the test is an objective one, this court has held that evidence that the defendant is suffering from battered woman syndrome is inherently subjective and therefore inadmissable as irrelevant to the defense of duress. *Id.* at 176. We see little distinction between Willis's evidence of battered woman syndrome and Morazan-Alvarez's evidence of PTSD.  It would be anomalous to bar such evidence to establish duress and then allow it in the back door to negate the voluntariness component of general intent.

Further, the defendant is attempting to raise the type of legal excuse that Congress sought to exclude when it "deleted the 'volitional prong' of the commonly accepted Model Penal Code approach which had permitted acquittal if the defendant 'as a result of mental disease or defect . . . lacks substantial capacity  . . . to conform his conduct to the requirements of the law.'" *United States v. Eff*, 524 F.3d 712, 719 (5th Cir. 2008) (quoting *United States v. Pohlot*, 827 F.2d 889, 896 (3d Cir. 1987)).  Congress intended to preclude defenses that

No. 12-50136

"permit exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection." *Id.,* quoting *Pohlot*, 827 F.2d at 890. Morazan-Alvarez's compliance with threats due to PTSD falls squarely within the type of mental defect that is no longer an acceptable defense to volitional action.

In addition, the district court found that the defendant had failed to present a sufficient evidentiary foundation of an imminent and impending threat as is required to support a duress instruction.[5] After a review of the record, we agree. According to the district court,

> The best that could be shown with any kind of evidentiary foundation or underpinning was that individuals traveling in the small group, one of them, was affiliated with the Zetas Cartel. And that the defendant said that she was threatened by this person. This is insufficient to establish a well-founded fear of immediate harm.

The district court relied on *United States v. Constante*, 380 F. App'x. 440 (5th Cir. 2010), which held that verbal threats, unaccompanied by a threat with a gun or a knife, were insufficient to establish a risk of immediate harm. As pointed out by the district court,

> Likewise, in the present case there is no evidence to suggest that the defendant was ever threatened with a weapon or given any reason to viably believe that a person in the group had the capacity to harm the defendant. And when you couple this with the fact that the person who supposedly threatened the defendant ended up in the bed of the pickup truck while she was in the cab of the truck there is no way we could get into any kind of impending actual threat.

---

[5] The district court decides as a matter of law whether the evidence submitted raises a factual question for the jury. *United States v. Branch*, 91 F.3d 699, 713 (5th Cir. 1996) ("[T]he district court is not required to put the case to the jury on a basis that essentially indulges and even encourages speculations.")

No. 12-50136

Also, as pointed out by the district court, according to Morazan-Alvarez's own statement, Morazan-Alvarez was willing to accompany Hernandez-Escobar to the border area in the middle of the night to pick up a woman whom she identified first as the mother of an unknown person and later as the mother of Hernandez-Escobar. No alleged threat or fear was experienced until they reached the pick up location. In short, the record does not support a conclusion that Morazan-Alvarez was credibly threatened prior to the time she embarked on the trip to the border and committed to engage in the conduct underlying her offense of conviction.

Also, the record belies Morazan-Alvarez's argument that she did not have the requisite intent to voluntarily participate in this offense. The evidence strongly supported testimony that Morazan-Alvarez orchestrated the pick up of the illegal aliens and intended for the aliens' passage to be successful. According to Hernandez-Escobar, Morazan-Alvarez arranged the transportation scheme, promised to compensate him for driving his vehicle to secure the aliens, communicated with other participants in the operation to ensure that the pick up was completed, and directed him to the pick up location. Evidence corroborating this testimony revealed that, on the night of the transportation, twenty-three calls were exchanged between Morazan-Alvarez's phone and an unidentified number in Austin, i.e., the alleged headquarters of the operation. Moreover, there was testimony that Morazan-Alvarez, who asserted that she was paid for her role in the enterprise, exhibited an interest in the transportation of the aliens and commanded the aliens to enable its successful completion; the evidence showed that Morazan-Alvarez opened the doors at the pick up location and directed the group to get into the truck, reassured the aliens of the likely success of the operation, and directed the aliens to "put [their] heads down" to avoid detection.

No. 12-50136

Finally, Morazan-Alvarez's conduct after agents stopped the truck was consistent with the fact that she had guilty knowledge.  Morgado-Castro testified that Morazan-Alvarez stated "[w]e are caught" when the truck was apprehended, and her inconsistent statements to agents regarding the offense suggest that she sought to conceal or obscure her role.  Her statement also reflected her awareness of the purpose of the trip to the border area; she told agents that Hernandez-Escobar "was a known  smuggler" and that she "could take [agents] to his house in Austin where he ha[d] as many as 40 illegal aliens stashed.  And that he gets paid something like $4,000 per person to smuggle illegal aliens."

## III.

For the foregoing reasons, we find that the district court did not abuse its discretion by excluding Morazan-Alvarez's proffered expert testimony. AFFIRMED.